IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LIN LUO,                                    )
                                            )
                    Appellant,              )
                                            )
            v.                              )   C.A. No. 20-600 (MN)
                                            )
MELINTA THERAPEUTICS, INC.,                 )
                                            )
                    Appellee.               )

## **<u>MEMORANDUM OPINION</u>**


Lin Luo, Silver Spring, MD – *Pro se* Appellant.

Joseph O. Larkin, Jason M. Liberi, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, DE; Ron E. Meisler, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Chicago, IL – Attorneys for Appellee.


March 15, 2021
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

Pending before the Court is an appeal by Lin Luo ("Appellant") from the Bankruptcy Court's *Findings of Fact, Conclusions of Law, and Order Confirming Modified Amended Joint Chapter 11 Plan of Reorganization of Melinta Therapeutics, Inc. and its Debtor Affiliates* (Bankr. D.I. 520)[1] ("the Confirmation Order") (A301), entered in the Chapter 11 cases of Melinta Therapeutics, Inc.[2] ("Melinta Therapeutics") and certain of its affiliates (together, "the Debtors"), which affirmed the Debtors' plan of reorganization (Bankr. D.I. 520-1) ("the Plan") (A358). Under the Plan, equity interests in Debtors were extinguished, and equity holders, like Appellant, did not receive a recovery. Appellant asks this Court to "reverse the confirmation order." (D.I. 16 at 70). For the reasons set forth herein, the Court will affirm the Confirmation Order.

## I.     BACKGROUND

### A.     The Debtors and the Restructuring Support Agreement

Melinta is a biopharmaceutical company focused on developing and commercializing differentiated antibiotics. (A1). As of the Petition Date (defined below), Melinta had four medications in its antibiotic portfolio, Baxdela, Vabomere, Orbactiv, and Minocin for injection. (*Id.*). Melinta had acquired Vabomere, Orbactiv, Minocin for injection, and other assets, on January 5, 2018 from The Medicines Company ("MedCo.") for consideration including certain deferred purchase price obligations ("the MedCo Transaction"). (A2 ¶ 10). Melinta funded the MedCo Transaction with approximately $147 million from Deerfield Private Design Fund III, L.P. and Deerfield Private Design Fund IV, L.P. ("the Supporting Lenders") pursuant to a Facility

---

[1]     The docket of the Chapter 11 cases, captioned *In re Melinta Therapeutics, Inc., et al.*, No. 19-12748 (LSS) (Bankr. D. Del.), is cited herein as (Bankr. D.I. __). The appendix (D.I. 26) filed in support of Appellant's answering brief (D.I. 25), is cited herein as "A__."

[2]     Melinta Therapeutics, Inc. is now known as Melinta Therapeutics, LLC. (D.I. 25 at ii).

Agreement dated January 5, 2018 ("Deerfield Facility Agreement" and the credit facility thereunder, "the Deerfield Facility"). (A7-8 ¶¶ 28-29). Obligations under the Deerfield Facility Agreement were secured by liens on substantially all of Melinta's assets. The Deerfield Facility Agreement imposed certain financial covenants on Melinta, including minimum sales and liquidity covenants. (*Id.*).

On December 31, 2018, Melinta entered into a senior unsecured subordinated convertible loan agreement ("Vatera Loan Agreement" and the facility thereunder, "the Vatera Facility") with Vatera, a substantial shareholder. (A9 ¶ 34). At its inception, the Vatera Loan Agreement provided up to $135 million in convertible loans. (A9-10 ¶ 35). The financial covenants imposed by the Vatera Loan Agreement were comparable to those imposed by the Deerfield Facility Agreement. (A10-11 ¶ 38).

Melinta experienced financial challenges following the MedCo Transaction. (A11-12 ¶ 40). Melinta cites slow sales growth, high up-front development costs, substantial distribution costs, and significant debt. (A13 ¶ 44). These challenges were amplified by two related lawsuits in the Delaware Court of Chancery stemming from the MedCo Transaction ("the MedCo Litigation"). (A13–14, ¶¶ 4-5). MedCo and other plaintiffs asserted that Melinta wrongly withheld payment of $80 million of deferred purchase price obligations and assumed liabilities due in connection with the MedCo Transaction. (*Id.*). Melinta did not deny that it withheld these payments but contended that the obligations were offset by significant affirmative claims against MedCo relating to the MedCo Transaction. (A14 ¶ 46). The MedCo Transaction was less valuable than projected, Melinta claims, with three antibiotics underperforming expectations. (A15 ¶ 48).

In light of these developments, Melinta determined that it would require additional liquidity to fund operations or relief from financial and other covenants under its prepetition credit facilities. (A16 ¶ 50). Melinta evaluated several potential new-money transactions but was unable to agree

to the terms of either a debt or equity transaction that would provide it sufficient capital on acceptable terms.  (A16 ¶ 51).  After considering alternatives (A16-17 ¶ 52), Melinta initiated a marketing process in September 2019 for both potential buyers and parties interested in providing financing.  (A19 ¶ 56).  Prior to the Petition Date, Melinta and its advisors contacted (or were contacted by) 77 parties with respect to a potential sale transaction, including 48 potential strategic buyers and 29 potential financial buyers, and received four non-binding indications of interest.  (A20 ¶ 58).  Melinta and its advisors had discussions with its principal stakeholders, including the Supporting Lenders and Vatera, concerning its strategic review process, stakeholders' interest in participating in one or more transaction alternatives, the benefits and challenges associated with each non-binding proposal, and each potential counterparty's diligence and timing requirements.  (A20 ¶ 59).  Melinta and its advisors determined that the value-maximizing option was a transaction with the Supporting Lenders ("Supporting Lender Transaction"), and accordingly, on December 27, 2019, Melinta and the Supporting Lenders entered into a restructuring support agreement (Bankr. D.I. 432-1) ("RSA").  (A21-22 ¶¶ 62-63).  The RSA provided that the Supporting Lender Transaction would function as a "stalking-horse" bid for Melinta in bankruptcy.  (A22-23, ¶ 65).  As contemplated by the RSA, the Supporting Lenders would exchange their secured claims for 100% of the equity in the Reorganized Debtors, if the Supporting Lender Transaction was the highest or otherwise best bid received after a competitive marketing process.  (A22 ¶ 63).

### B.  The Chapter 11 Cases, Initial Term Sheet, and Bidding Procedures Order

On December 27, 2019 ("the Petition Date"), the Debtors filed their Chapter 11 petitions and thereafter continued their marketing efforts.  On December 30, 2019, the Debtors filed a

motion by which they sought approval of procedures to govern a formal postpetition marketing and auction process ("the Bidding Procedures Motion").

Vatera and the Committee initially opposed the Bidding Procedures Motion. Following arm's-length negotiations, however, the Debtors, the Supporting Lenders, MedCo, Vatera, and the Committee reached a preliminary global settlement on February 7, 2020 (Bankr. D.I. 275) ("the Initial Term Sheet"). (A109 ¶ 8). The Initial Term Sheet provided: the bidding procedures would be amended to extend the period to submit bids from 30 days to 45 days, allow partial bids for the Debtors, and allow the Committee to suggest potential bidders and to provide input as a "consultation party" on bids received (Bankr. D.I. 275 § 10); upon emergence, a trust would be established for the benefit of general unsecured creditors trust ("GUC Trust") and would receive certain prepetition causes of action held by the Debtors (*id*. § 5); the GUC Trust would be funded with $3.5 million cash from the Supporting Lenders (*id.*); the Supporting Lenders would waive their general unsecured claims against the Debtors (*id*. § 6); all potential "challenges" of the Debtors and the Committee to the claims and liens of the Supporting Lenders would be settled, (*id*. § 7); the Committee would support the Plan if the Supporting Lenders were approved by the Bankruptcy Court as the successful bidder (*id*. § 11); Vatera and Medco (each subject to the results of the Investigation described below) would support and not object to the Plan if the Supporting Lenders were approved by the Bankruptcy Court as the successful bidder (*id*. §§ 1, 11); Vatera and MedCo (each subject to the results of the Investigation described below and to the Bankruptcy Court's approval of certain release provisions) would subordinate their claims to the first $3.5 million distributed from the GUC Trust (*id*. §§ 2, 3); and the Debtors (subject to the results of the Investigation described below) would not contribute any claims or causes of action against the

Debtors' present and former directors and officers, Vatera (and its affiliates and representatives), or MedCo (and its affiliates and representatives) to the GUC Trust (*id*. § 1).

The Initial Term Sheet also contemplated an investigation of potential colorable claims that the Debtors may have held against their present and former directors and officers, Vatera (and its affiliates and representatives), and MedCo (and its affiliates and representatives) ("the Investigation") (*id*. § 1). The Initial Term Sheet required that (a) one of Melinta's independent directors investigate any colorable claims that the Debtors may have held against their present and former directors and officers or against Vatera; and (b) the Debtors investigate claims that they may have held against MedCo. (*Id*.). In both cases, the relevant investigator was tasked with determining whether any causes of action held by the Debtors should be transferred to the GUC Trust, after consulting with the Committee and considering, among other factors: (a) the cost and expense of pursuing the relevant claim, (b) the likelihood of success on the merits, and (c) the consideration that had been or would be provided under the Global Settlement by the party that was the subject of the claim. (*Id*.).

On February 11, 2020, the Bankruptcy Court entered an order approving the proposed Bidding Procedures, as amended in accordance with the Initial Term Sheet (Bankr. D.I. 280) ("Bidding Procedures Order").

C.      **The Disclosure Statement**

Thereafter, the Debtors filed a proposed plan and disclosure statement. The proposed plan encompassed two alternative paths under the RSA and Global Settlement, depending upon the outcome of the Investigation, and the Disclosure Statement accompanying the proposed plan set out the different projected recoveries to holders of general unsecured claims. In the first scenario, where the investigator, in consultation with the Committee, determined that colorable claims existed against a subject of the Investigation (and the claims were not settled), those claims would

be transferred to the GUC Trust for prosecution.  In that event, the subject of the Investigation would no longer be bound to subordinate its recovery to other holders of general unsecured creditors and could oppose the Plan.  In this scenario, Debtors projected a recovery of 0.8% without attempting to ascribe a value to litigation claims.  Under the second scenario, where the Investigation yielded no colorable claims against a target (or any such claims were settled), the Plan would contain releases for the subjects of the Investigation who would be bound not to object to the Plan.  In this scenario, the Global Settlement Term Sheet would remain in place, the general unsecured claims of Vatera and MedCo would be subordinated in recoveries to other holders of general unsecured claims, and the non-Vatera, non-MedCo holders of general unsecured claims would receive a projected recovery of 21%.

The proposed plan provided that equity interests in Debtors would be extinguished and equity holders would not receive a recovery.  This outcome was consistent with the liquidation analysis attached as an exhibit to the proposed disclosure statement.  In a liquidation scenario, Deerfield was projected to receive only 45% to 57% recovery on its secured debt, and holders of administrative claims and general unsecured claims were not projected to receive a recovery.

On February 25, 2020, following an extensive hearing, the Bankruptcy Court entered an order approving the disclosure statement for the Debtors' proposed plan (Bankr. D.I. 345) ("Disclosure Statement") and entered an order establishing procedures for soliciting and tabulating votes to accept or reject the proposed plan (Bankr. D.I. 322 ("Solicitation Procedures Order"). Appellant did not object to approval of the Disclosure Statement or the Solicitation Procedures Order or participate in that hearing.  Appellant does not dispute that she was served with a copy of the Disclosure Statement and other materials as required by the Solicitation Procedures Order. (Bankr. D.I. 379).

### D.     Bidding, Investigation, and Global Settlement

Consistent with the Bidding Procedures Order and the Initial Term Sheet, the Debtors continued their marketing efforts in consultation with the Committee.  (A108-09 ¶ 6).  In total, 86 potential buyers were contacted, including buyers suggested by the Committee, and 33 non-disclosure agreements ("NDAs") were executed.  (*Id.*).  No competing bids were received by the March 2, 2020 bid deadline, the auction was cancelled in accordance with the bid procedures, and the Debtors identified the Supporting Lender Transaction as the successful bid.  (A109 ¶ 7).

On March 12, 2020, the Investigation concluded with a determination: (a) that no claims against any of the Debtors' present and former directors and officers or MedCo would be contributed to the GUC Trust, and (b) subject to the agreement of Vatera to contribute $500,000 to the GUC Trust, no claims against any of the Vatera Persons would be contributed to the GUC Trust.  (A109-10 ¶ 9).  In connection with the foregoing agreement, MedCo and Vatera agreed to further subordinate their general unsecured claims to the $500,000 contributed to the GUC Trust by Vatera.  The contribution of $500,000 by Vatera to the GUC Trust and the subordination of MedCo and Vatera's unsecured claims were the product of extensive, arm's-length negotiations, and were incorporated into an amended term sheet filed on March 13, 2020 (Bankr. D.I. 411) ("Global Settlement").

### E.     Plan Confirmation

On April 2, 2020, the Bankruptcy Court held a hearing to consider confirmation of the proposed plan.  (*See* Bankr. D.I. 502, 4/2/20 Hr'g Tr.).  The proposed plan provided that, upon emergence, all prepetition equity interests in Melinta were extinguished and that the Supporting Lenders received 100% of the equity of reorganized Melinta in satisfaction of their secured claims.  (A386, Plan § 3.02(c); A388, Plan § 3.02(h); A390, Plan § 5.04(b)).  The proposed plan also incorporated the terms of the Global Settlement, and thus provided for a meaningful recovery by

general unsecured creditors through the GUC Trust.  (*See* A386-87, Plan § 3.02(d); A389, Plan § 5.03; A391, Plan § 5.04(e); A111-12 ¶ 11-14; A121 ¶ 46; A127-28 ¶ 68; *see also* A134, Bankr. D.I. 345-2 (Liquidation Analysis)).

Appellant filed multiple written objections to confirmation of the proposed plan.  (*See e.g.,* Bankr. D.I. 427).  At the confirmation hearing, Appellant made extensive arguments and had the opportunity to cross-examine the Debtors' witnesses.  (*See* A157-58 at 24:8-25:22; A168-69 at 35:1-36:10; A176-78 at 43:6-45:5).  Appellant, however, did not present evidence to support her claims or cross-examine the Debtors' witnesses.  (*See* A260 at 127:18-20).

Based on the testimony presented at the hearing, the Bankruptcy Court overruled Appellant's objections and found that: (1) the Plan was proposed in good faith (A255 at 122:21-24); (2) the Supporting Lender Transaction was market-tested and thus accurately reflected the value of the Debtors (A256 at 123:6-18); (3) the Plan was approved by both voting classes — the secured claims under the Deerfield Facility ("Class 3") and general unsecured claims ("Class 4"), without counting the votes of any insider (including Vatera) (A258-59 at 125:1-126:4); and (4) the Debtors satisfied all disclosure, solicitation, and notice requirements under applicable law (A251 at 118:14; A259 at 126:16-23).  On April 11, 2020, the Bankruptcy Court entered the Confirmation Order.  The Plan became effective on April 20, 2020 ("the Effective Date").  (*See* Bankr. D.I. 542).

## F.    The Reconsideration Memorandum

Following confirmation of the Plan, Appellant filed dozens of papers seeking reconsideration of the Plan (Bankr. D.I. 578, 646, 648, 696, 778, 797, 808, 814) and challenging other aspects of the Debtors' Chapter 11 cases (Bankr. D.I. 581, 585, 613, 614, 615, 647, 694, 695, 697, 708, 709, 768, 769, 771, 772, 773, 792, 793).  The Bankruptcy Court informed the Debtors that certain of Appellant's filings would be considered as a motion to reconsider the Confirmation Order, and, on July 2, 2020, the Bankruptcy Court issued a thorough Memorandum which carefully

addressed the many issues raised by Appellant and other equity holders.  *See In re Melinta Therapeutics, Inc.,* 623 B.R. 257 (Bankr. D. Del. 2020) ("Reconsideration Memorandum").  In denying Appellant's requests for reconsideration, the Bankruptcy Court noted that Appellant "did not present any evidence at the [confirmation] hearing" and that the Plan had been confirmed "against [a] backdrop of unrefuted evidence, and with an accepting vote of each class entitled to vote." *Id.* at 261.

Following entry of the Reconsideration Memorandum, Appellant filed multiple additional letters challenging the Plan and other aspects of the Debtors' Chapter 11 cases.  At a hearing on September 17, 2020, the Bankruptcy Court again denied Appellant's request to reconsider the Plan and denied certain other motions by Appellant and other shareholders to, among other things, bar certain parties from owning equity interests in reorganized Melinta and "clarify" the Plan.  (*See* Bankr. D.I. 839, 9/17/20 Hr'g Tr., A467 at 19:9-13) ("There have probably been close to 50 filings with respect to various issues, and that just simply has to stop.  I ruled on confirmation.  I considered your motion, your first motion, to cancel the sale.  I ruled on that."); *see also Order Denying Bar Motions* (Bankr. D.I. 826); *Order Denying Motions to Clarify* (Bankr. D.I. 828).

### G.    The Appeal

On April 30, 2020, Appellant filed her notice of appeal.  (D.I. 1).  Appellant continued to file numerous post-confirmation requests for relief in the Bankruptcy Court but did not seek a stay of the Plan until October 19, 2020 – nearly six months after the Effective Date.  (Bankr. D.I. 843). The appeal is fully briefed.  (D.I. 16 at 25-30).[3]  Joinders to the Debtors' answering brief were

---

[3]        On February 23, 2021, Appellant filed a *Designation of Additional Items on Appeal* (D.I. 31) and an *Opening Brief – Addendum – Evidences and Faudulent* [sic] *Bankruptcy Motives* (D.I. 32).  On March 10, 2021, Appellant filed another addendum.  (D.I. 33).  These documents were filed more than two months *after* briefing concluded with the filing of Appellant's "Revised Reply Brief" (D.I. 29) on December 15, 2021 which leaves Appellee

filed by Vatera (D.I. 18) and MedCo (D.I. 19).  The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II.    <u>JURISDICTION AND STANDARD OF REVIEW</u>

The Confirmation Order is a final order, and the Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a).  On appeal, district courts "review the bankruptcy court's legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof."  *In re Trans World Airlines, Inc*., 145 F.3d 124, 131 (3d Cir. 1998).

The Court's application of facts to a controlling legal standard – in this case, 11 U.S.C. § 1129 governing plan confirmation – is reviewed for clear error.  *See Pa. Higher Educ. Assistance Agency v. Gillins*, 2003 WL 22844398, at *1 (D. Del. Nov. 24, 2003) (reviewing lower court's application of facts to controlling legal test for clear error); *In re Paige*, 2008 WL 1994905, at *2 (D. Utah May 8, 2008) (determination was factual where there was "no real issue as to the controlling law" but only to the court's application of that legal standard to facts).  Under the clear error standard, a factual determination will not be set aside unless "that determination is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data."  *In re Dr. R.C. Samanta Roy Inst. of Sci. Tech. Inc.*, 465 F. App'x 93, 96 (3d Cir. 2011) (citation omitted).  Moreover, where the lower court bases its findings upon an uncontroverted record, those findings should not be found clearly erroneous.  *See In re Dunn*, 2015 WL 5165141, at *2 (E.D. Va. Aug. 18, 2015) (finding that none of the bankruptcy court's findings were clearly erroneous, because appellant presented no evidence, other than self-serving testimony, to support its claim).

---

no opportunity to respond.  These filings were procedurally improper and will not be considered by the Court.  Further unauthorized filings may be docketed but not considered.

## III.   **ANALYSIS**

At the heart of this appeal is Appellant's contention that Melinta and its creditors conspired to manufacture a bankruptcy resulting in cancellation of equity interests.  Appellant's opening brief, which ignores page limits and is nearly 80 single-spaced pages, contains dozens of factual allegations that all tie into her claims that the Plan and Chapter 11 Cases were not pursued in good faith, that votes on the Plan were not properly tabulated, that Class 8 equity interests were not treated in accordance with the Bankruptcy Code, and that the Supporting Lenders or other parties-in-interest are receiving a disparate recovery in comparison with other, similarly situated, parties. Appellant focuses much of her opening brief recounting and challenging the validity of the Debtors' pre-bankruptcy conduct.  As the Bankruptcy Court correctly noted, however, these grievances merely allege legal conclusions regarding the validity of the plan process and the Plan itself.  *Melinta Therapeutics,* 623 B.R. at 264.

Appellant failed to object below to many of the orders that she attacks in her opening brief, including the orders approving the Debtors' Key Employee Incentive Plan, the Disclosure Statement, the Bidding Procedures, and the Debtors' assumption of the Restructuring Support Agreement.  (*See e.g.*, D.I. 16 at 36-37, 57-58; D.I 29 at 20-23).  Moreover, many of the factual allegations set forth in Appellant's brief were not asserted until after the Bankruptcy Court had entered the Confirmation Order, and were only asserted in filings by which Appellant asked the Bankruptcy Court to reconsider the Confirmation Order.  The Bankruptcy Court properly denied Appellant's numerous post-confirmation requests, and none of those orders are subject to this (or any) appeal.  As to those issues timely raised below, Appellant identifies no error in the Bankruptcy Court's determination, which was made on an undisputed record, that the Plan met the requirements for confirmation set forth in § 1129 of the Bankruptcy Code.

**A.    The Debtors Prosecuted the Chapter 11 Cases in Good Faith**

Under § 1129 of the Bankruptcy Code, a plan may be confirmed only if it "has been proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Appellant's main argument on appeal is that the bankruptcy was manufactured by a conspiracy among Melinta and its creditors to cancel equity and that the resulting Plan was proposed in bad faith.  (*See* D.I. 16 at 12-40).  In support, Appellant cites extensively to pre-bankruptcy SEC filings, which reflected, as the Bankruptcy Court correctly observed, "either a rosier picture of Debtors' financial situation, a company on the verge of financial success and/or what Shareholders believe were improper impairment charges taken prepetition."  *Melinta Therapeutics*, 623 B.R. at 268.  "Notwithstanding the statements in the SEC filing, the evidence showed that Debtors marketed the company from September 2019 through March 2020, with the post-petition marketing conducted through a court-approved marketing process consistent with the circumstances of this case.  And the result of that marketing process was included in the Plan."  *Id.* at 268-69 (citing *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 461 (3d Cir. 2006)).

As the Third Circuit has instructed, "[T]he market's reaction to a sale best reflects the economic realities of assets' worth."  *SubMicron*, 432 F.3d at 461.  Here, the Debtors' value was market-tested and the resulting sale, which best reflects the economic realities of their worth, was the basis for the Plan.  Appellant's citations to SEC filings regarding the Debtors' value does not support a conclusion that the Debtors did not propose their Plan in good faith, and Appellant offers no evidence to controvert the Bankruptcy Court's good faith finding.

In support of confirmation, Debtors presented evidence that they, like other companies in this industry, had encountered significant economic hardship and filed for bankruptcy in order to preserve and reorganize their business while maximizing recovery for creditors.  (A18-19 ¶¶ 55; A22 ¶ 63).  Debtors presented evidence that throughout the bankruptcy, they worked in good faith

with major stakeholders to design a Plan that maximized value for the Supporting Lenders while also achieving a meaningful distribution for general unsecured creditors, who, under an uncontroverted liquidation analysis, would otherwise have received little or no recovery.  (A256, 4/2/20 Hr'g Tr. at 123:19-24; A125–26 ¶ 61; Bankr. D.I. 345-2).  The record further reflects that, as a result of these efforts, the Plan received the support of both voting classes, the Committee, and the Debtors' largest creditors.  Appellant presented nothing to controvert this evidence.

The record further supports a finding that the bankruptcy petition was filed in good faith. The Third Circuit has held that a determination as to whether a petition was made in "good faith" requires an examination of all the facts and circumstances in the case.  *See In re Am. Cap. Equip., LLC*, 688 F.3d 145, 157 (3d Cir. 2012).  Here, the record reflects that Melinta's bankruptcy filing was the result of: (a) soft sales consistent with industry trends, (b) an unexpected shortfall in the value of the three antibiotics acquired in the MedCo Transaction, (c) Melinta's corresponding inability to service its debt; and (d) Melinta's inability to obtain additional capital absent a restructuring of its existing liabilities.  (*See* A11-12 ¶¶ 40; A13 ¶ 44; A15 ¶ 48; A16 ¶ 50; A18-19 ¶ 55).  The record further reflects Melinta's efforts to address these challenges and avoid bankruptcy, including seeking liquidity from outside sources, negotiating waivers of covenants, and extensively marketing the Debtors.  (A16-17 ¶ 52; A18-19 ¶ 55; A19 ¶ 56; A20 ¶ 59; A21-22 ¶ 62; A22 ¶ 63).  Although ultimately unsuccessful, the evidence of Debtors' efforts to maximize value is undisputed and supports a finding that the Debtors made the decision to file the petition – not their creditors.

The record further supports the finding that the Plan was proposed in good faith.  "In analyzing whether a plan has been proposed in good faith under § 1129(a)(3), 'the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"  *In re Am. Cap. Equip., LLC*, 688 F.3d at 156

(quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004)).  "[U]nder Chapter 11, the two 'recognized' policies, or objectives, are 'preserving going concerns and maximizing property available to satisfy creditors.'"  *In re Am. Cap. Equip., LLC*, 688 F.3d at 156 (quoting *Bank of Am. Nat.'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)).  The leading bankruptcy treatise explains that "denial of confirmation for failure to satisfy section 1129(a)(3) should be reserved for only the most extreme of cases."  7 COLLIER ON BANKRUPTCY ¶ 1129.02 (Richard Levin & Henry J. Sommer eds., 16th ed.).  Whether a plan was proposed in good faith is a legal question subject to *de novo* review by the district court, but factual findings supporting the bankruptcy court's determination that a plan was proposed in good faith should be reviewed for clear error.  *Wells Fargo, N.A. v. Bear Stearns & Co. (In re HomeBanc Mortg. Corp.)*, 945 F.3d 801, 811 (3d Cir. 2019), *cert. denied*, 2020 WL 5882295 (U.S. Oct. 5, 2020).

The Bankruptcy Court's conclusion that the Plan was proposed in good faith is based on its findings that the Plan: (a) was the result of arm's-length negotiations among the Debtors' major constituencies; (b) was not proposed for any improper purpose; (c) resulted in meaningful recovery for general unsecured creditors; and (d) incorporated a market-tested acquisition of the Debtors. (A255-57 at 122:21-124:23).  The evidence supporting these findings is undisputed.  (A255 at 122:21-24; A255; A435).  These findings support the conclusion that the Plan maximized creditor recoveries and was consistent with the purposes of the Bankruptcy Code.  *See In re Am. Capital Equip.*, 688 F.3d at 156.

Although Appellant repeatedly asserts that the Plan was procured by fraud, Appellant identifies no agreement to bankrupt the Debtors or to defraud investors.  Rather, Appellant insists that the evidence of the alleged conspiracy is contained in "secretive NDAs," although Appellant also states that "we cannot know what else was agreed" to in these alleged agreements.  (D.I. 16

at 50).  Appellant mischaracterizes these industry-standard agreements,[4] and the Court agrees with Debtors that such vague allegations would fail to state a claim for fraud at the pleading stage and are insufficient to overturn a lower court's findings as clearly erroneous.  *See Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.*), 355 B.R. 438, 455 (Bankr. D. Del. 2006) (averments of fraud must be made with particularity).

Finally, Appellant's allegations of a conspiracy among the Supporting Lenders and Vatera to drive Melinta into bankruptcy find no support in the record.  (*See* D.I. 16 at 11).  The record reflects that Vatera initially opposed several aspects of the Debtors' bankruptcy, including proposed adequate protection for the use of the Supporting Lenders' cash collateral.  (*See* Bankr. D.I. 221, 1/28/20 Hr'g Tr. at 183:4-13).  Appellant's assertion that Vatera received stock in exchange for its cooperation does not support its conspiracy allegations either.  The record is clear that all existing equity interests in Melinta (including Vatera's existing common stock) were extinguished under the Plan.  (A388, Plan § 3.02(h)).  Contrary to Appellant's allegations, the evidence supports a finding that Vatera's cooperation with the Plan was not a foregone conclusion but rather the result of arm's-length and often contentious negotiations.  (*See* A110-11 ¶¶ 8-10); A111-12 ¶¶ 12-14).

---

[4]     As the Reorganized Debtors point out, NDAs are critical to the negotiation of any restructuring transaction, particularly with respect to public companies. In order to successfully negotiate and implement financial transactions, companies are often required to disclose material non-public information or other commercially sensitive information to prospective counterparties. *Hoffman v. Sbarro, Inc.*, 1997 WL 736703, at *1 (S.D.N.Y. Nov. 26, 1997) ("[C]ompetition-related information [is] normally subject to a non-disclosure agreement . . . ."). To ensure that sensitive information is safeguarded and not used improperly, companies require that counterparties enter into NDAs, which generally set out the scope of permissible use of sensitive information. The record reflects such agreements are of the same type that the Debtors entered into with the Supporting Lenders, Vatera, and potential bidders. (*See* A21 ¶ 60 n.16 (describing use of NDA in connection with a recapitalization proposal)).

Appellant identifies no clear error in the Bankruptcy Court's underlying factual findings, and the Court affirms its determination that the Plan was proposed in good faith.

**B.    The Plan's Cancellation of Equity Interests Is Consistent with the Bankruptcy Code**

In support of the alleged conspiracy, Appellant makes two related allegations relating to the Plan's treatment of equity interests.  First, Appellant asserts that the Supporting Lenders acquired the equity interests in Melinta for less than its true value, as a third-party bidder would have paid enough to allow for shareholder recovery.  (*See* D.I. 16 at 44).  Second, Appellant contends that certain parties retained equity interests in contravention of § 1123(a)(4).  (*Id.* at 58).  Appellant identifies no evidence to support these allegations and demonstrates no clear error in the Bankruptcy Court's findings with respect to the Plan's treatment of equity interests.

Appellant's first argument – that some hypothetical third-party bidder would have paid enough to allow for recovery to equity holders – finds no support in the record.  As reflected in the Plan, following a thorough marketing process, the Supporting Lender Transaction was the only offer received for the Debtors, and it provided insufficient value to support recoveries for equity holders in this case.  (A108-09 ¶ 6; A256-57, 4/2/20 Hr'g Tr. at 123:6-124:1).  Courts recognize that "[a] market test is the best evidence of a company's value at a given point in time."  *Off. Comm. of Unsecured Creditors of Champion Enters. Inc. v. Credit Suisse (In re Champion Enters., Inc.)*, 2012 WL 3778872, at *35 (Bankr. D. Del. Aug. 30, 2012) (citing *SubMicron*, 432 F.3d at 461 (holding that a free market auction "best reflects the economic realities" of a debtor's worth)).  Here, the Debtors were marketed pursuant to court-approved Bidding Procedures that were the result of a meaningful compromise between major stakeholders.  (A90-91 § 10; Bankr. D.I. 280).  The marketing process was court-supervised and conducted with the support and participation of the Committee.  At no point in the process did Appellant or any other party raise an allegation that

the Debtors were not complying with the Bidding Procedures Order or otherwise seeking to maximize value for their stakeholders.  The record further reflects that the marketing process was extensive.  Between September 2019 and February 2020, Debtors contacted 86 potential buyers, including those suggested by the Committee, and executed 33 NDAs.  (A108-09 ¶ 6; Bankr. D.I. 164 ¶¶ 17-18).  Relying on the unrefuted evidence of this market test, there is no error in the Bankruptcy Court's finding that "the valu[e] of this company ha[s] been proven by the marketing process."  (A255-56, 4/2/20 Hr'g Tr. at 122:21-123:18).

Contrary to Appellant's assertions that the Supporting Lenders controlled the marketing process, it is clear from the record that the Committee was a consultation party, and thus had significant input into the evaluation and solicitation of bids, whereas the Supporting Lenders did not. (*See* Bankr. D.I. 280-1, Art. VIII).  Appellant presented no evidence in support of its argument that the Debtors artificially deflated its value by improperly writing off its intangible assets.  (*See* D.I. 16 at 36).  Under the Bidding Procedures, potential bidders were granted access to a data room containing confidential information that would have allowed bidders to come to their own conclusion about the value of the Debtors and their intangible assets.  (Bankr. D.I. 164 ¶ 10). Appellant presented no evidence in support of its argument that Vatera's participation in the Global Settlement categorically prevented outside bids.  (*See* D.I. 16 at 45-46).  Although Vatera agreed not to challenge the Plan if (among other conditions) the Supporting Lender Transaction was deemed the "Successful Bid" under the Bidding Procedures, the Global Settlement Term Sheet did not state that Vatera would have opposed a sale to a third-party bidder.  (*See* A92 § 11; *see also* Bankr. D.I. 280-1 § VI(E) (defining "Successful Bid")).  Moreover, the Global Settlement Term Sheet reflects agreements designed to enhance the competitiveness of the marketing process by, among other things, allowing partial bids and extending the bid deadline.  (A90-91 § 10).

Appellant's second argument – that certain parties retained equity interests in contravention of § 1123(a)(4) – also finds no support in the record. As Debtors correctly point out, the Plan provides for equal treatment of all holders of Class 8 Equity Interests, and all existing equity interests, including the equity interests held by Vatera, MedCo, the Supporting Lenders, and current and former directors and officers of Melinta, were extinguished under the Plan. (A118 ¶ 33; A388, Plan § 3.02(h)). Appellant's reliance on "secretive NDAs" that are not in the record must be rejected. (D.I. 16 at 58). Appellant also cites pre-Effective Date disclosures of various parties' holdings of Melinta stock, but these values do not reflect post-Effective Date stock ownership. (*Id.*). Under the Plan, 100% of the new common stock of reorganized Melinta was issued to the Supporting Lenders on the Effective Date. (A386, Plan § 3.02(c); A390, Plan § 5.04(b)). Finally, the fact that neither MedCo nor Vatera objected to the Plan is not indicative of a conspiracy to protect existing equity in contravention of the Plan, as Appellant asserts. (*See* D.I. 16 at 60). Rather, it is the result of the Global Settlement. (*See* A85; *see also* A510, 9/17/20 Hr'g Tr. at 62:13-15 (Bankruptcy Court remarking, "the plan provides that everyone's stock, no matter when they received it or how they received it, pre-bankruptcy is cancelled.").

## C. The Plan Was Accepted by At Least One Impaired Class

Two classes were entitled to vote on the Plan: Class 3 (secured claims under the Deerfield Facility) and Class 4 (general unsecured claims). Class 8 equity holders were deemed to have rejected the Plan, and Debtors were required to show that Class 8 could be "crammed down" under § 1129(b). Appellant asserts that the Bankruptcy Court erred in finding that the Plan was accepted[5]

---

[5]     Under § 1126, "A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan."  11 U.S.C. § 1126(c).

by at least one impaired class, without counting the vote of any insider, as required under § 1129(a)(10). Specifically, Appellant contends that (i) MedCo and the Supporting Lenders were insiders, (ii) the Supporting Lenders' secured claims were not impaired under the Plan, and (iii) the votes of general unsecured creditors were improperly tabulated. (*See* D.I. 16 at 51-53).

As to Appellant's first argument, allegations that MedCo and the Supporting Lenders controlled Melinta do not demonstrate clear error in the Bankruptcy Court's finding that neither the Supporting Lenders nor MedCo was an insider.[6] (*See* D.I. 16 at 53-54). Insiders of a debtor corporation include any "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B). This list is not exhaustive; a creditor also may be considered an insider where there is a close relationship between the debtor and the creditor and "anything other than closeness to suggest that any transactions were not conducted at arm's length." *Schubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 396-97 (3d Cir. 2009) (quoting *Anstine v. Carl Zeiss Meditech AG (In re U.S. Med., Inc.)*, 531 F.3d 1272, 1277 (10th Cir. 2008)).

Appellant points to the fact that Melinta's former interim chief executive officer was once employed by MedCo, but that does not demonstrate that MedCo exerted control over Melinta prior to or during the bankruptcy. (*See* D.I. 16 at 53-54). Moreover, the Supporting Lenders never had the power to direct the appointment of Melinta's chief executive officer, other executives, or board members, and Appellant offers no evidence to the contrary. (*See id.*). The Investigation, with the cooperation of the Committee, found no colorable claims against any of Melinta's current or

---

[6]     The Reorganized Debtors do not dispute that Vatera met the statutory definition of an "insider." Class 4 voted to accept the Plan even without counting Vatera's vote. (*See* D.I. 25 at 45 n.13).

former directors and officers.  (A85-86 § 1; A109-10 ¶ 9; Schwartz Declaration ¶ 18; A257, 4/2/20 Hr'g Tr. at 124:4-16 ("The undisputed evidence is that those investigations were extensive, they were complete, they included interviews with people, reviews of Board minutes, correspondence, other documents.").  Again, Appellant's reliance on "secretive NDAs" is unavailing, and Appellant thus fails to demonstrate clear error in the Bankruptcy Court's finding that MedCo and the Supporting Lenders were neither statutory nor "non-statutory" insiders.

Appellant's second argument – that the Supporting Lenders' Class 3 secured claims were not impaired under the Plan – must also be rejected.  (*See* D.I. 16 at 61).  A class is impaired under a plan unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."  11 U.S.C. § 1124(1); *see In re Union Meeting Partners*, 160 B.R. 757, 771 (Bankr. E.D. Pa. 1993) ("'[I]mpairment' is a term of art and includes virtually any alteration of a claimant's rights . . . even where a creditor's rights are improved by a plan.").  Class 3 was impaired because its rights were altered under the Plan as the Supporting Lenders received equity (rather than payment in full in cash at maturity, as the Deerfield Facility Agreement requires) in exchange for their secured claims. (A386, Plan § 3.02(c)).  In sum, the Supporting Lenders are not insiders, and their votes may be considered when determining whether Class 3 has accepted the Plan for purposes of § 1129(a)(10).  The Court finds no error in the Bankruptcy Court's finding that the Plan satisfied § 1129(a)(10) through the acceptance of Class 3 alone.  (A258-59, 4/2/20 Hr'g Tr. at 125:20-126:4).

Even assuming Appellant could prevail on its Class 3 argument, as the Debtors correctly point out, the Plan also independently satisfies § 1129(a)(10) through the acceptance of Class 4 general unsecured creditors.  (*See* D.I. 25 at 45-49).  As explained in the Disclosure Statement, the Plan constitutes a separate plan of reorganization for each of the six Debtors, and votes were tabulated and counted on a per-Debtor basis.  (*See* Disclosure Statement § I(D)).  Consistent with

the Solicitation Procedures Order, no creditor voted more than once as to any of the six Debtors. (*See* Bankr. D.I. 487, Voting Declaration, Ex. A).  Appellant's third argument – that Class 4 did not vote to accept the Plan – relies on mischaracterizations of the Solicitation Procedures Order and the Voting Declaration.  (*See* D.I. 16 at 51-53).

When analyzed on a Debtor-by-Debtor basis, the Plan was accepted by general unsecured creditors at each entity, even excluding Vatera's vote.  (*See* Bankr. D.I. 487, Voting Declaration, Ex. A).  As to three of the Debtors (CEM-102 Pharmaceuticals, Inc., Cempra Pharmaceuticals, Inc., and Targanta Therapeutics Corporation), general unsecured creditors voted unanimously to accept the Plan.  (*Id*.).  As to the other three Debtors, non-insider votes were sufficient to satisfy the thresholds for acceptance under § 1126(c) of the Bankruptcy Code.  (*Id*.).  As the Bankruptcy Court explained, even assuming arguendo that the Supporting Lenders and MedCo were insiders, non-insider general unsecured creditors for Melinta Therapeutics (the only entity in which Appellant held an equity interest) would have still have overwhelmingly voted to accept the Plan by a margin of 17 creditors holding $933,400.02 in claims against two creditors holding $22,751 in claims.  *See Melinta Therapeutics,* 623 B.R. at 267.

Each of alleged voting defects raised by Appellant was considered and properly rejected by the Bankruptcy Court on an undisputed record.  Appellant demonstrates no error in the Bankruptcy Court's finding that the Plan satisfied § 1129(a)(10).

### D.    Appellant's Remaining Arguments Are Unavailing

Appellant repeatedly asserts that the Plan failed to disclose compensation to be paid post-Effective Date to directors, officers, and insiders.  All compensation to be paid to those parties was disclosed, however, as required under § 1129(a)(5).  (*See* A127 ¶ 66; *see also* Bankr. D.I. 476, Ex. I, *Notice of Filing of Third Plan Supplement to the Amended Joint Chapter 11 Plan of Reorganization of Melinta Therapeutics, Inc. and Its Debtor Affiliates*).  Appellant has offered no

contradictory evidence.   Appellant further asserts that the Plan impermissibly includes pre-bankruptcy acts and omissions.  (*See* D.I. 16 at 61-63).  The Plan's exculpation provision, however, does not include such conduct.  (A369, Plan § 1.54 (defining "Exculpated Parties")).   Finally, Appellant asserts that under the Plan, former equity holders are deemed to grant releases if they fail to "opt-out" of those releases.  (*See* D.I. 16 at 63-66).   The Court finds no basis for this interpretation of the Plan's release provisions.  (*See* A375-76, Plan § 1.116 (defining "Releasing Parties"); A369, Plan § 1.53 (defining "Excluded Releasing Parties" as "any Holder of a Claim against or Interest in the Debtors that was entitled to vote on the Plan, voted to reject the Plan, and elected to opt out of the releases provided for in the Plan")).

## IV.   **CONCLUSION**

Appellant's allegations are unsupported by the record and establish no basis to disturb the Bankruptcy Court's conclusion that confirmation of the Plan under § 1129 was proper.  Because the Court has determined that the appeal fails on its merits, it does not consider Debtors' contention that the appeal has been rendered equitably moot, and should therefore be dismissed.[7] For the reasons set forth herein, the Confirmation Order will be affirmed.  An appropriate order follows.

---

[7] The bases of Debtor's claim of equitable mootness are that (i) the Plan has been substantially consummated, (ii) the relief sought by Appellant in this appeal – to "reverse the confirmation order" (D.I. 16 at 70) – would fatally scramble the Plan or significantly harm third parties who have justifiably relied on Plan confirmation, and (iii) Appellant failed to seek a stay of the Confirmation Order until October 19, 2020, six months after the April 20, 2020 Plan Effective Date occurred, and has consistently delayed her prosecution of the appeal.  (*See* D.I. 25 at 26-39).